Richard C. OPPENLANDER et al., on be-
half of themselves and others simi-
larly situated, Plaintiffs,
and
Edmund A. Spencer, Plaintiff-Intervenor,
v.

STANDARD OIL COMPANY (INDI-
ANA), Defendant,
and
Midwest Oil Corporation, Nominal De-
fendant and Beneficial Plaintiff.

Civ. A. No. C–3414.

United States District Court,
D. Colorado.

Feb. 22, 1974.

J. Vernon Patrick, Jr., Berkowitz, Lefkovits & Patrick, Birmingham, Ala., John M. Scott, J. Lyndell Kirkley, Brown, Herman, Scott, Dean & Miles, Fort Worth, Tex., Patrick M. Westfeldt, Edwin S. Kahn, Bruce W. Sattler, Wiley E. Mayne, Jr., Holland & Hart, Denver, Colo., for plaintiffs.

Arthur T. Susman, Prins, Flamm & Susman, Chicago, Ill., Arthur L. Fine, Brenman, Sobol & Baum, Denver, Colo., for intervenor.

Thomas S. Nichols, Arthur E. Otten, Jr., Davis, Graham & Stubbs, Denver, Colo., William R. Jentes, Frank Cicero,

Jr., Steven D. McCormick, Kirkland & Ellis, Chicago, Ill., for defendant Standard.

Peter F. Breitenstein, Fairfield & Woods, Denver, Colo., for nominal defendant Midwest.

James C. Owen, Jr., Denver, Colo., for Arthur E. Johnson.

Richard J. Farrell, Vice President—Law, L. Bates Lea, Gen. Counsel, Ernest L. Godshalk, Associate Gen. Counsel, Standard Oil Co. (Indiana), Chicago, Ill., for Standard Oil Co. (Indiana).

R. W. (Bill) Glenn, Plano, Tex., Donald M. Feuerstein, Vice President—Law, Salomon Bros., New York City, for Class Members.

Paula D. Mulligan, pro per, Lawrence P. Mulligan, Smith, Haughey, Rice, Roegge & Gould, Grand Rapids Mich., Maurice E. Gosnell, Gosnell, Benecki & Borden, Ltd., Lawrenceville, Ill., Robert G. Clark, III, pro se, filed appearances in the action but did not announce their presence.

## MEMORANDUM OPINION AND ORDER WITH RESPECT TO AWARD OF COUNSEL FEES AND COSTS

FINESILVER, District Judge.

Presently before the Court in this class action securities case is the petition for an award of counsel fees and costs to counsel for the class and intervenor.

The parties to this litigation have entered into a Memorandum of Agreement Regarding Settlement of Midwest Litigation dated December 29, 1973. Following notice to interested parties by mailing and publication in *The Wall Street Journal* (national edition) of January 9, and January 16, 1974, a full and complete settlement hearing was held on February 11, 1974. At the conclusion of the day long hearing, the settlement was approved as "fair, reasonable and adequate"; Findings of Fact and Conclusions of Law approving the settlement were formally entered on February 22, 1974; the proceedings are more fully described in that Order, which is incorporated herein by reference.

## SUMMARY OF THE LITIGATION

### I.

In August, 1971, Standard proposed a merger with Midwest at a ratio of 1.68 Standard shares to each share of Midwest. Ten of the thirteen members of Midwest's board of directors voted against the proposed merger, on the ground that Standard's offer was inadequate and unfair to the minority stockholders of Midwest. Standard (which then owned 67% of Midwest's stock) thereupon fired the directors who voted against the merger. Midwest was left with three Standard officers as its board. Approximately 6,000 minority shareholders of Midwest who (along with Standard) had for years approved by proxy and otherwise the management of Midwest by Arthur E. Johnson, David R. Murphy, and others, no longer had a voice in the affairs of Midwest. This action was filed by plaintiffs—minority shareholders of Midwest—on September 23, 1971.

### II.

This extremely complex litigation includes both a direct (class) action and a derivative shareholders action. In the direct (class) action plaintiffs asserted violations of Sections 10, 14(e) and 20 of the Securities and Exchange Act of 1934, Rule 10b–5 promulgated thereunder, breach of fiduciary duties, actual and constructive fraud, misrepresentation both by statements and omissions, and other common law wrongs. In the derivative action, plaintiffs asserted violations of the Clayton and Sherman antitrust acts and violations of fiduciary, contractual, and other duties of defendant.

The class of Midwest minority shareholders represented by plaintiffs num-

bered more than 6,000, and the number of Midwest shares sold or held by class members during the class period in question is about 1,385,083 shares.

The detailed Amended Complaint filed in the action includes defendant's Exchange Offer Prospectus dated March 2, 1972; these instruments are incorporated herein by reference. The litigation, in part, centers around the recitals in the Prospectus. The claims set forth in the Amended Complaint were denied by Standard, and all phases of the case as described below were vigorously resisted by Standard.

On February 11, 1972, intervention by Edmund A. Spencer, a Midwest Minority shareholder, was allowed. On May 18, 1972, the Court determined that the action should proceed as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all Midwest shareholders (other than Standard) on or after January 1, 1971.

By earlier Orders, claims asserted in the case have been separated for three trials. The direct (class) claims under the Federal Securities Laws were scheduled to be tried first—commencing on February 4, 1974—with a separate trial of the state law direct claims to follow. The derivative suit was to be tried thereafter.

### III.

Plaintiffs' principal claims as set forth in the Amended Complaint and as made more definite during pre-trial proceedings were that plaintiffs and other shareholders of Midwest who had held Midwest shares since January 1, 1971, had been injured by reason of defendant Standard's alleged violations of §§ 10(b) and 14(e) of the Securities Exchange Act and Rule 10b–5 of the Securities and Exchange Commission. More specifically, plaintiffs made the following separate claims:

(a) That Midwest shareholders who tendered their Midwest stock for $105 pursuant to the Midwest Invitation for Tender dated January 15, 1971, had allegedly been damaged by reason of asserted misrepresentations and non-disclosures of material facts in connection with the Tender Offer, for which Standard was liable both directly and indirectly as the controlling stockholder of Midwest under § 20 of the Securities Exchange Act;

(b) That Midwest shareholders who had sold their Midwest shares in the open market on or after January 1, 1971, had also been allegedly damaged by reason of asserted misrepresentations or non-disclosures of material facts on the part of Standard, either directly or indirectly through its control of Midwest;

(c) That Midwest shareholders who had exchanged their Midwest shares pursuant to Standard's Exchange Offer Prospectus, dated March 2, 1972, at a ratio of 1.68 Standard shares for one Midwest share, had allegedly been damaged by reason of Standard's asserted misrepresentations and non-disclosures of material facts in connection with the Exchange Offer; and

(d) That present Midwest shareholders had allegedly suffered damages and diminution in the value of their Midwest stock by reason of Standard's alleged conduct.

In addition to claims asserted under the federal securities laws, plaintiffs asserted various claims on behalf of present and former Midwest shareholders for alleged common law fraud and other wrongs on the part of Standard. Plaintiffs also asserted claims derivatively on behalf of Midwest for Standard's alleged violations of the federal antitrust laws and for its alleged breach of fiduciary, contractual, and other duties owed to Midwest.

The Court entered a preliminary Ruling on Issues of Reliance, Causation and Damage on December 12, 1973, and di-

rected counsel to meet and confer on possibility of settlement of the litigation; serious settlement discussions followed in Chicago, culminating in a Memorandum of Agreement Regarding Settlement signed December 29, 1973, and filed with the Court on January 3, 1974.

### APPLICATION BY COUNSEL FOR PLAINTIFFS (AND INTERVENOR) FOR ALLOWANCE OF ATTORNEYS' FEES AND OUT OF POCKET EXPENSES; NOTICE TO SHAREHOLDERS.

Counsel for plaintiffs' class and intervenor have filed applications for allowance of attorneys' fees and reimbursement of out-of-pocket expenses. (See Court filings of January 4, 1974, and January 30, 1974). The applications generally request an amount equal to approximately 18 percent (18%) of the total recoveries in cash and stock for tenderors, exchangors and sellers of stock on open market and reimbursement of out-of-pocket expenses not to exceed $100,000.

Plaintiffs' counsel and counsel for plaintiff-intervenor have stipulated that the Court is to make only one joint award of attorneys' fees to counsel for plaintiffs and the class. Out of the joint award, plaintiffs' counsel have agreed to remit to counsel for plaintiff-intervenor 4 percent (4%) of such award of legal fees as the Court may make. Counsel for plaintiff-intervenor have agreed to bear their own out-of-pocket expenses and the out-of-pocket expenses of the plaintiff-intervenor. By motion filed February 11, 1974, counsel for plaintiff-intervenor have partially withdrawn their petition filed herein January 30, 1974, as it seeks any separate allowance over and above the allowance requested by the Joint Application filed herein by counsel for plaintiffs and the class on January 4, 1974.

The amount of attorneys' fees and expenses requested by plaintiffs' counsel and intervenor's counsel were included in a publicized Notice to Class Members as Ordered by the Court.

Pursuant to this Court's January 4, 1974 Order, the IMPORTANT NOTICE OF PROPOSED SETTLEMENT published in *The Wall Street Journal* (national edition) on January 9 and 16, 1974, and mailed by defendant Standard to all class members advised them as follows:

" . . . As explained more fully hereafter, any interested person may be heard with respect to the fairness, reasonableness and adequacy of the terms and conditions of the proposed settlement, and with respect to allowances to plaintiffs' counsel.

\*  \*  \*  \*  \*  \*

### ALLOWANCES REQUESTED BY PLAINTIFFS' COUNSEL

"If the proposed settlement is approved . . . , counsel for the class, will apply to the Court for an allowance for their legal services in the amount equal to approximately eighteen per cent (18%) of the total recoveries, in cash and stock, for tenderors, exchangors, and sellers on the open market, assuming all file claims pursuant to the proposed settlement, and approximately eighteen per cent (18%) of the additional 0.25 shares of Standard stock recovered for the benefit of present stockholders of Midwest (above the 1.68 shares they would have received if the merger approved and publicly announced in 1971 had been consummated). In addition, said counsel for the class will apply to the Court for reimbursement of their out-of-pocket expenses in an amount not to exceed $100,000, to be charged equitably against all recoveries effected pursuant to the settlement. \*  \*  \* The allowance for attorneys'

fees, if any, and reimbursement of expenses is entirely within the discretion of the Court.

\* \* \* \* \* \*

### V.

At the hearing to be held before this Court on February 11, 1974, commencing at 10 A.M., in the United States Courthouse, Denver, Colorado, the Court will consider: (a) whether the proposed settlement should be approved . . . ; (b) what allowances (if any) should be made to plaintiffs' counsel for their legal services and disbursements; and (c) other matters relating to the proposed settlement. At said hearing any interested person may be heard with respect to the above matters; provided that a written statement of the person's intention to appear, together with any papers or briefs to be submitted are filed with the Clerk of this Court on or before February 5, 1974."

We expressly find that adequate notice and an opportunity to be heard has been afforded all interested parties.

In line with this finding, although all class members were fully advised by said NOTICE of the amount of the requested allowance for the legal services and disbursements and of the right of any class member to object and be heard at the hearing with respect thereto, it is significant that not one objection was voiced by any class member to the requested allowance.

Based upon proofs of claim filed as part of the record in this proceeding, a number of business firms have filed substantial claims pursuant to the terms of the settlement. These firms are highly sophisticated, accustomed to hiring attorneys, and familiar with the value of legal services. A number of individuals having substantial Midwest stock holdings are also members of the class. We observe that shareholders with a broad spectrum of stock holdings and business sophistication and expertise have not presented in writing or in person any objections whatsoever to the request for an allowance of attorneys' fees in the amount specified.

One class member, with a very substantial interest in the litigation and a major Midwest shareholder, Arthur E. Johnson, former Chairman of the Midwest Board of Directors, appeared at the hearing by his attorney, James C. Owen, Jr., Denver, Colorado, and expressed his opinion that the allowance requested by plaintiffs' counsel was reasonable and should be awarded.

### SETTLEMENT

#### I.

Based on testimony and exhibits adduced at the fairness of settlement hearing on February 11, 1974, and our prior connection with the litigation, we are fully conversant with the terms and conditions of the settlement and the value thereof to the members of the class. The merger ratio and the adjustment of the March 2, 1972, exchange ratio, in accordance with the provisions of the settlement agreement, have been fixed and determined based on the closing price of the common stock of defendant Standard traded on the New York Stock Exchange on February 8, 1974, which was the last business day preceding the fairness hearing conducted by this Court on February 11, 1974. Based on that price for the Standard stock the gross value of the approved settlement to the members of the class as of that date was approximately as follows:

| | |
|---|---|
| Merger | $16,732,521 |
| Exchange Offer | 10,320,838 |
| Tender Offer | 7,000,000 |
| Open Market Sellers | 1,600,000 |
| | $35,653,369 |

Of that gross amount, we find that the incremental recovery effected for the class by virtue of this litigation and

the efforts of counsel for plaintiffs and intervenor is not less than the following:

| | |
|---|---|
| Merger increment | $ 2,167,425 [1] |
| Exchange Offer shares | 10,320,838 [2] |
| Tender Offer (approx.) | 7,000,000 |
| Open Market Sales (approx.) | 1,600,000 |
| TOTAL | $21,088,265 |

Plaintiffs' counsel have also astutely conferred a benefit for the class by including a provision in the Settlement Agreement requiring adjustment of the merger ratio and the shares to be issued to exchangors if Standard stock closed below $95 per share on the New York Stock Exchange on the last business day prior to the February 11, 1974 hearing. The provision is a valuable benefit to class members affected thereby, because Standard stock in fact closed at $90.375 per share on February 8, 1974. Had this provision not been included, taking into consideration a decline in the market price of Standard stock, the recovery for the class would have been reduced by approximately $1,300,000.

## II.

In brief, the Settlement Agreement provides that, subject to Court approval and other adjustments:

(a) Standard shall pay $13 as damages for each Midwest share tendered pursuant to the Midwest Invitation for Tender dated January 15, 1971, by persons who file proofs of claim which are allowed by the Court;

(b) Standard shall pay $6 as damages for each Midwest share held of record (directly or by nominee) on or after January 1, 1971 and sold on the open market prior to December 29, 1973, by persons who file proofs of claim allowed by the Court;

(c) Standard shall issue as an adjustment in the exchange ratio provided in the Standard Exchange Offer dated March 2, 1972, an additional 0.22 shares of Standard common voting stock for each Midwest share exchanged pursuant to said Exchange Offer, by persons who file proofs of claim allowed by the Court;

(d) Midwest shall be merged with a subsidiary of Standard as promptly as possible after Court approval of the Settlement Agreement, pursuant to a plan of merger whereby Standard shall issue 1.93 shares of Standard common voting stock for each Midwest share held of record as of the effective date of the merger by persons other than Standard; and

(e) This case and amended Complaint shall be dismissed with prejudice and without costs as to each and every claim asserted herein or which might have been asserted herein (whether direct, individual, class, derivative, or otherwise), including any and all claims with respect to the merger provided for in subparagraph (d) above.

The Settlement Agreement provided a formula for the number of Standard shares to be issued for each Midwest share in the event the closing price of Standard common stock traded on the New York Stock Exchange on February 8, 1974 exceeded $105 or was less than

---

1. This amount is the present value of approximately 31,850 additional shares of Standard common stock to be issued as part of the settlement of this action, over and above the 1.68 shares per share of Midwest which present Midwest stockholders would have received under the Midwest merger which was approved and publicly announced in 1971. The announced merger was abandoned by Standard after the Complaint in this action was filed, seeking, *inter alia*, to enjoin the announced merger.

2. This amount is the present value of approximately 114,072 additional shares of Standard stock to be issued as part of the settlement as an adjustment of the exchange ratio with respect to shares of Midwest exchange in 1972, over and above the 1.68 shares of Standard stock per share of Midwest originally issued in 1972, pursuant to Standard's March 2, 1972 Exchange Offer.

$95. The "floor" figure is significant in settlement final calculations for the reason that the closing price of Standard Common stock on February 8, 1974 was $90.375 per share.

The Settlement Agreement also requires Standard to fulfill certain S.E.C. requirements and applications.

The Settlement Agreement further provides that counsel for plaintiffs and the plaintiff class should be entitled to apply for and receive such reasonable allowances for their legal services and out-of-pocket disbursements in connection with this litigation as the Court might order.

### CRITERIA IN DETERMINING AMOUNTS OF REASONABLE ATTORNEY FEES

Rule 23, Federal Rules of Civil Procedure, is silent as to the Court's authority to fix attorneys' fees. Rule 23(e) merely provides for the approval by the Court of the compromise or settlement of a class action.

The authority and discretion for fixing attorneys' fees in connection with the approval of such settlement arises, therefore, under the general equitable powers of the Court. Some authorities liken this approach to a *quantum meruit* allowance for services rendered.

Where the efforts of claimants and their attorneys have produced a settlement fund to be divided among all the members of a class, it has been recognized that the named claimants (here plaintiffs and intervenor), as the representatives of the class, are authorized to contract for and to incur all proper expenses of litigation. It has been likewise recognized that the settlement fund realized through efforts of such plaintiffs and their attorneys should bear the burden of the allowances for attorneys' services. Thus each member of the class who benefits will be required to contribute his due proportion of the fees allowed and expenses involved.

There is no fixed standard or guide by which we can determine reasonable attorney fees, but the entire litigation must be considered and evaluated to arrive at a just allowance fair to all parties.

With this thought in mind, we have considered the following criteria in the allowance and award of attorney fees.

I. Benefits Conferred Upon the Members of the Class; Results Achieved.

II. The Magnitude, Complexity, and Uniqueness of the Litigation.

III. The Court's Knowledge of the Nature, Extent and Quality of Services Rendered by Counsel.

IV. Time and Effort Expended by Counsel in the Litigation.

V. Advance Fee Arrangements, If Any, Between Counsel and Members of the Class.

VI. Public Policy Considerations.

VII. Extent and Basis of Objections to Allowance of Attorney Fees.

### I. BENEFITS CONFERRED UPON THE MEMBERS OF THE CLASS; RESULTS ACHIEVED.

Prior to the litigation the class members were not bereft of a return on their investment in Midwest shares. They generally received a benefit in the Standard Exchange Offer—over their investment. Thus we do not have a case where everything was lost. As a general observation the contrary is true.

For that reason the benefits conferred upon the members of the class were substantial and the fund recovery in excess of $35,000,000 is justifiably significant in this type of litigation. Through this successful litigation the Midwest shareholders realized an unexpected gain.

While other criteria in determining reasonable attorney fees are legitimate considerations, the amount of the recovery, and end result achieved, is of primary importance.

Professor Hornstein, in his treatise on setting attorneys' fees in class action suits, notes, "There have been enough cases to constitute binding precedents as to the relative importance of one element—result achieved." Hornstein, Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards, 69 Harv.L.Rev. 658, 682 (1956).

In accordance with this view numerous cases reveal the recognition of this factor as relevant and highly persuasive in the award of attorney fees. In awarding attorney fees in class actions the courts have cited "the value of the settlement", Derdiarian v. Futterman Corp., 254 F.Supp. 617, 620 (S.D.N.Y. 1966); "the amount recovered", Trans World Airlines, Inc. v. Hughes, 312 F. Supp. 478, 480 (S.D.N.Y.1970) and Perlman v. Feldmann, 160 F.Supp. 310, 311, (D.Conn.1958); "the results achieved" for the class, Philadelphia Elec. Co. v. Anaconda Amer. Brass Co., 47 F.R.D. 557, 559 (E.D.Pa.1969); "[t]he result of the case, because that determines the real benefit to the client", Rogers v. Hill, 34 F.Supp. 358, 363 (S.D.N.Y. 1940).

"[T]he fee should be measured in relation to the benefits conferred upon the members of the class. There is no better test than this of the efficacy of the services rendered." Illinois v. Harper & Row Publishers, Inc., 1972 Trade Reg. Rep. ¶ 74,302 at 92,270 (N.D.Ill.1972).

The institution of the suit, highly professional case preparation by plaintiffs' and intervenor's counsel, counsel's experience in complex litigation, and posture in settlement conferences were of crucial importance in bringing this litigation to successful financial recovery. The recovery can be attributed to efforts of counsel to effectuate a satisfactory recovery.

We also note that the recovery was realized without trial and further considerable expenses of prolonged litigation were negated.

Recovery in any amount was problematical in this difficult type of litigation. We conclude that the result attained was not possible without litigation.

The recovery inuring to the benefit of the class pursuant to the Court approved settlement is one of the largest recoveries realized by trial or by settlement of litigation under the securities laws of the United States. That outstanding recovery alone makes this case and the legal services rendered to the class unique and extremely successful.

## II. MAGNITUDE, COMPLEXITY AND UNIQUENESS OF THE LITIGATION.

Many unique and complex issues were presented in this litigation. The class action questions presented were without precedent in this District, especially with respect to such matters as whether there were conflicts within the class, whether sub-classes should be established, whether there were defenses personal to some members of the class, whether present holders and open market sellers of Midwest stock were properly included within the class, and whether Standard should be permitted to engage in discovery of class members (and if so, the nature and extent thereof).

The appropriate measure of damages, including the possible application of unjust enrichment principles; the "market impact" approach advanced by plaintiffs; and questions with respect to causation and reliance, involving the proper construction and application of Affiliated Ute Citizens v. United States, 406 U. S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) presented novel and difficult problems of first impression in this Court.

The litigation also involved unique and substantial issues of law in the technical area of SEC Rule 10b–5, Section 14(e) of the Securities and Exchange Act of 1934, the interlocking directorate

provisions of the Clayton Act (Section 8), the scope of attorney-client privilege in connection with a corporation with interlocking directors and in derivative suits, the effect of price and wage controls on the value of Midwest's stock at various times and on the possible damages awardable herein, the tax consequences of any judgment or settlement, investigation of the common law of fraud and directors' duties under Nevada, Colorado, Indiana and Illinois law, difficult, complex and oft-disputed class action questions (discussed in more detail below), difficult questions concerning the separation of trials and the right to trial by jury in connection therewith.

In addition, the litigation involved areas of the law such as Section 7 of the Clayton Act and the proof required for antitrust recovery under that section, the standing of a shareholder to bring a derivative action for antitrust relief under Section 7 of the Clayton Act, the relationship of the antitrust claims to the securities claims herein, statutes of limitation as they affected various claims herein, and the measure of actual and punitive damages appropriate to this case.

Neither plaintiffs' nor defendant's counsel has the benefit of a prior judgment or ruling in a similar case brought by the government or a private party. Thus, there was no prior litigation, either in a government-inspired or a private commercial lawsuit, that terminated in a judgment favorable to the position of plaintiffs in the instant litigation.

Principal plaintiffs, because of their previous managerial or directorate positions with Midwest, had some knowledge of aspects of Standard's control of Midwest and bona fides of the tender offer. However, extensive in-depth discovery was necessary to establish a viable lawsuit.

Discovery was as extensive and detailed as in any recent case in this district. Thus problems in connection with discovery, including difficult areas of attorney-client privilege, involving Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971), and the applicability of the work product doctrine to documentary discovery in this case likewise presented many novel issues. See order of Court dated September 14, 1973, dealing with discovery by plaintiffs in regard to Standard's defenses of attorney-client privilege, and work product.

It should be kept in mind that plaintiffs were former or present shareholders of Midwest and did not have derivative power of discovery of Standard's documents without order of Court. This issue was sharply litigated.

Also special problems arose with respect to the position of Midwest Oil Corporation in the litigation, the attempted neutrality of counsel for Midwest, and whether the stockholder-plaintiffs were entitled to have access to communications between Midwest and its prior attorneys.

In our *in camera* examination of claimed privileged documents (Standard's and Midwest's) it was clearly evident that the factual and legal questions inherent in the litigation were substantial. The task of plaintiffs' case preparation could be classified as monumental.

Although the major securities transactions complained of occurred during the period from January 1971 to date, discovery was conducted with respect to related matters from 1960 to date. Discovery was not conducted against a mediocre adversary. We have a smattering of Midwest shareholders (a relatively small corporation) doing battle against one of the country's giant corporations —Standard.

Demonstrative of the complex, unique character of this litigation and the exhaustive, uninterrupted advocacy of

counsel for defendant Standard and counsel for the plaintiffs and the class is the index of papers filed in Court. Twenty-two separate volumes of such pleadings and a total of 463 court papers were filed through the end of January, 1974. Massive interrogatories and massive answers appear in the court files. Moreover, motions and briefs were filed with respect to novel legal issues in the developing field of class actions, federal securities laws, attorney-client privilege and work-product, and other matters inherent in the litigation.

Documents were also obtained from Morgan Stanley & Co. and Goldman, Sachs & Co., New York City, investment bankers and financial advisers to Standard and Midwest.

Depositions were taken in Fort Worth, Houston, Denver, Las Vegas, Chicago, Franklin, Penn., and New York. A list of deponents appears in the court files.

In addition depositions on written questions pursuant to Rule 31, Federal Rules of Civil Procedure, were taken of executives of Standard Oil Co., Goldman, Sachs, Morgan Stanley & Co., Phillips Petroleum Company, Mobil Oil Corporation and others.

Plaintiffs' counsel crisscrossed the country at least 150 times on discovery and trial matters. Discovery by deposition was intense and exhaustive. Depositions began within two months from the time the complaint was filed and continued into late 1973. Defendant's counsel opposed some of plaintiffs' interrogation of George V. Myers, a director and executive of both Standard and Midwest, by instructing Mr. Myers not to answer questions propounded by plaintiffs' counsel. Court orders compelling answers were entered, and ultimately the Myers deposition was completed. However, the Myers deposition alone required trips to Chicago on three separate occasions and was the subject of Rule 37 motions, extensive briefing and oral argument before this Court. The deposition of John E. Swearingen, Chairman of the Board and Chief Executive Officer of Standard, consumed more than three days. A reading of the Myers and Swearingen depositions demonstrates that they were searching, hard fought and difficult.

This litigation also had a technical side apart from the numerous legal questions outlined above. In addition to the extensive review of documents, oral depositions and written discovery efforts, plaintiffs have represented to the court that they consulted with independent experts in order to prepare for trial and to evaluate the documents and the testimony being elicited in connection with discovery. It is readily apparent that the information developed by plaintiffs' counsel in the course of discovery was of a technical engineering or financial nature.

It has also been represented by plaintiffs that in order to understand the petroleum engineering materials, plaintiffs' counsel conferred with Raymond F. Kravis, independent engineer in Tulsa, Edgar L. Leissner, former Midwest engineer, Ralph W. Collins, Midwest Vice President and engineer in Denver, L. F. Peterson, independent engineer and a plaintiff, in Ft. Worth, Houston and Denver, Robert W. Harrison, independent engineer in Houston, and J. C. McCarthy, a former Amoco engineer in Franklin, Pa.

The matter of conferring with financial and securities experts and analysts was also extensively undertaken by plaintiffs' counsel. The search for and consultation with experts and other potential witnesses required plaintiffs' counsel to travel to New York, Denver, Houston, Tulsa, Franklin, Pa. and Shreveport, Louisiana.

## III. COURT'S KNOWLEDGE OF THE NATURE, EXTENT, AND QUALITY OF SERVICES RENDERED BY COUNSEL.

### I.

The Court has presided over all phases of this case since October 1971 and is thoroughly familiar with the litigation and extent of and quality of services rendered by counsel for plaintiffs, intervenors, Standard and Midwest.

Professional services of all principal attorneys in this litigation were of the highest order; all aspects of this case were handled with responsibility, thoroughness, and diligence. Counsel are commended for exceptional services rendered on behalf of their respective clients.

The case has been hard fought by counsel from beginning to end. No quarter was asked and none given. Most issues in the case and pretrial matters were arduously and assiduously prepared and argued.

The Court has thorough and personal knowledge of the high professional standing and reputation of counsel.

We have personally observed and heard oral argument from all principal counsel for plaintiffs in various hearings before this Court, personally read all motions and briefs filed during the course of the proceedings, and received and considered the testimony and evidence adduced at the February 11, 1974 hearing concerning the standing, ability, and reputation of said counsel.

J. Vernon Patrick, Jr., who acted as lead counsel for the plaintiffs and the class in this action, and his law firm, Berkowitz, Lefkovits & Patrick, Birmingham, Alabama, are experienced, highly qualified, skilled, and nationally recognized for their expertise in securities and antitrust litigation and in stockholder, class, and derivative actions. Mr. Patrick has chaired seminars on securities, and class actions sponsored by the American Law Institute, New York Law Journal, the American Bar Association and others. (Resumes of Mr. Patrick and other principal counsel have been filed with the Court and appear in court files).

The law firm of Holland & Hart, of Denver, Colorado, one of the three firms which represented the plaintiffs and their class in this action, is the largest law firm in Colorado and the Rocky Mountain area. The Court is well familiar with the law firm, its reputation, and the skill and great diligence which its members and associates have displayed in a great number of other cases before this Court, as well as the present case. The three Holland & Hart partners who have principally worked on the case are Patrick M. Westfeldt, Edwin S. Kahn and Harry L. Hobson. During the course of the litigation 17 associates of the firm rendered legal services for the benefit of the plaintiffs and the class. The three associates who have worked principally on the case are Bruce W. Sattler, David G. Palmer and Wiley E. Mayne, Jr. Their expertise in the fields involved in this litigation is extensive and well documented.

The law firm of Brown, Herman, Scott, Dean & Miles of Fort Worth, Texas, has been of counsel for plaintiffs and class in this action from the inception of the litigation. The partners who principally worked on the case are John M. Scott, William M. Brown and J. Lyndell Kirkley. The Court has been well impressed with the high quality of legal services rendered by this firm before the court in this action.

Counsel for plaintiff-intervenor, appearing by Arthur L. Fine, Esq. of the firm of Brenman, Sobol & Baum, Denver, Colorado and Arthur T. Susman, Esq. of the firm of Prins, Flamm & Susman, Chicago, Illinois, also performed legal services of the highest order on behalf of intervenor.

As noted before this case has been vigorously but professionally contested at every stage of the litigation.

Defendant's attorneys have the highest reputation and have demonstrated exceptional professional skill in every pleading and filing made with this Court; they are skilled attorneys.

Lead counsel for defendant Standard, William R. Jentes, is widely known and professionally respected nationally. His law firm Kirkland & Ellis, Chicago, Illinois, is of national stature. He has participated in important securities and antitrust litigation and has spoken at seminars sponsored by the American Bar Association and other groups. He was a symposia speaker on antitrust class actions recorded in 41 Antitrust L.J. 229 (1972). In addition Standard was ably and well represented in hearings before this Court by Frank Cicero and Steven McCormick of Kirkland & Ellis, Chicago.

At the outset of this litigation, Joseph G. Hodges, Denver, now deceased, a lawyer of great experience and professional stature was lead local counsel for defendant Standard. Since his death, Arthur E. Otten and Thomas S. Nichols, of Davis, Graham & Stubbs, Denver, have been lead local counsel for defendant Standard and have demonstrated great ability in all of their appearances before this Court. The Court is likewise well familiar with the law firm, its reputation and skill in complex litigation. They are well respected and highly competent attorneys. Ms. Andrea Williams, of Davis, Graham & Stubbs has also participated in this litigation.

Although he assumed a neutral role with respect to the merits of this litigation, Peter F. Breitenstein, an outstanding lawyer and partner in the firm of Fairfield & Woods, Denver, counsel for Midwest Oil Corporation represented his client with vigor and steadfastly resisted efforts by plaintiffs' counsel to obtain certain documents which Midwest felt to be within the attorney-client privilege or work product.

## II.

We have also considered testimony elicited from attorneys of stature not connected with the case on the value and quality of the attorneys' services.

In support of their joint application for allowances, plaintiffs called Stanley L. Kaufman, Esq., of New York, Hugo L. Black, Jr., Esq., of Miami and John S. Pfeiffer, Esq., of Denver, to testify at the hearing. Biographical resumes of the witnesses were received by the Court as exhibits at the hearing held on February 11, 1974.

Messrs. Kaufman, Black and Pfeiffer are experienced trial attorneys who have practiced in state and federal courts throughout the country. They enjoy high standing in the profession and are fully qualified as experts to testify with respect to the fairness and reasonableness of the allowances sought by counsel for plaintiffs. Their credentials are well documented.

Messrs. Kaufman, Black and Pfeiffer testified that they were familiar with the legal services performed by counsel for the plaintiffs and the class, that they had reviewed the Joint Application for Attorney fees, the pleadings, and the files of plaintiffs' counsel, that they were familiar with the recovery effected, and that they were familiar with the reputation, skill and professional standing of counsel for plaintiffs and the class, on the one hand, and of counsel for defendants on the other. Each of these attorneys testified that, in his opinion, the allowances sought were fair and reasonable.

Mr. Stanley Kaufman testified that highly qualified lawyers with large Wall Street firms presently charge from $150 to $200 per hour for non-contingent matters. He testified that in his opinion the quality of the legal services rendered in this case by plaintiffs' counsel and the calibre of such counsel, were no less than that of the best Wall Street firms. He testified that he was person-

ally familiar with the ability, diligence and persistence of Mr. Patrick in complex securities litigation because Mr. Patrick and he were appointed lead counsel and worked closely together in the *Seeburg-Commonwealth United Multi-District Litigation* in the Southern District of New York. He stated that he was familiar with the reputation of Holland & Hart, local lead counsel, and had been greatly impressed by his review of their organization of thousands of documentary exhibits, files and pleadings and by the high calibre of members of that firm whom he had met. Although he was not personally familiar with the reputation of the Brown, Herman, Scott, Dean & Miles firm of Fort Worth, Texas, he had noted from an examination of *Martindale Hubbell Law Directory* that that firm has an "AV" rating, and he had been impressed by Mr. Scott and Mr. Kirkley, who had reviewed their participation in this case with him before the hearing.

Mr. Kaufman also testified that it is of great importance to the public that, in stockholder litigation, minority stockholders be able to secure the services of highly competent attorneys of ability and integrity, such as plaintiffs' counsel in this case.

Mr. Kaufman testified that based on his own experience, courts normally allow from 20% to 40% of the recovery in class actions similar in complexity and magnitude to the instant action. He expressed the opinion that where the recovery is as large as that effected here, the fee allowance should be toward the lower end of that range, or about 20%.

He indicated familiarity with the facts of this case and with the risks assumed by plaintiffs' counsel. He related that on two prior occasions he had considered participating in this litigation himself. In 1971 he had decided, based in part upon the great risks involved in undertaking such litigation on a contingent basis, not to do so.

He further testified that he was approached in 1973 by one of counsel for plaintiffs with respect to the possibility of his assuming a major position in the litigation, as one of plaintiffs' counsel, that he and his partners gave careful consideration to the matter, and that they declined, because of the complexities of cases involving valuations, the difficulty of obtaining competent experts, and the risks involved in accepting employment on a contingent fee basis.

He testified that he did not feel that normal hourly rates for routine non-contingent matters should be accorded great weight. In response to a question from the Court he testified that he did not feel that a sliding scale percentage award, based upon the amount recovered, was appropriate under the facts of this case. He testified that the adoption of a sliding scale would tend to discourage plaintiffs' counsel from reaching for the "top dollar" for their clients in settlement negotiations.

Mr. Hugo Black, Jr. testified that he was familiar with the ability and reputation of Mr. Patrick, having worked with him in several important securities cases. He testified that Mr. Patrick is a lawyer of great professional integrity and ability, aggressive, a skilled negotiator in settlement matters.

Mr. Black testified that it is of particular importance that adequate fee awards be made in the field of class actions, in order to insure that lawyers of the highest professional integrity and ability will be willing to undertake such employment. For this reason, Mr. Black testified that the award of fees should not be based upon normal hourly rates in non-contingent matters, and a sliding-scale percentage fee allowance would be inappropriate under the circumstances of this case. He also testified that in one important security and antitrust case, he secured a recovery of $4 million and was awarded a fee of $1 million.

John S. Pfeiffer, Denver, Colorado, is a highly experienced litigator who has frequently practiced before this Court. He testified that the fee sought by plaintiffs' counsel herein is in his opinion, entirely reasonable. He testified that he did not know of an attorney who would have taken this case on a purely contingent basis for less than 25 per cent to 33⅓ per cent of the possible recovery. He testified, by way of example, concerning his own fee arrangements, which were agreed to by a knowledgeable business client, in Continental Baking Co. v. Old Homestead Bread Co., 476 F.2d 97 (10th Cir. 1973). In that case his firm received a legal fee of $1.4 million in a case in which the gross recovery was $3.9 million (including treble damages and court-awarded attorneys' fees of $290,000). He testified that his client was satisfied with the legal fees involved in that case.

Mr. Pfeiffer testified that in antitrust litigation although the statute provides for an award of attorneys' fees to the client, the fees awarded usually constitute reimbursement of only part of the attorney fees actually paid by the client. Mr. Pfeiffer was highly complimentary of the efforts of plaintiffs' counsel in the case as reflected by his review of the files of Holland & Hart. He testified that he had some familiarity with the case because of its having been filed in Denver and he had been aware of developments in the case from time to time.

### III.

In addressing ourselves to a reasonable and fair award of attorney fees and value of legal services in complex litigation, we are not embarking into a strange and unknown field.

Unlike determining the value of services rendered in other specialties and professions, the value of legal services are within the Court's own knowledge. As an attorney, the Court brings its own experience to the question of a fair evaluation of services rendered against the total backdrop of the exigencies of the litigation and other described factors.

### IV. TIME AND EFFORT EXPENDED BY COUNSEL IN THE LITIGATION.

We have received and considered time records and affidavits of plaintiffs' counsel Berkowitz, Lefkovits & Patrick; Brown, Herman, Scott, Dean & Miles; and Holland & Hart. Those documents show the time spent in this action by each of the attorneys for plaintiffs, the firms' normal hourly rates and other factors normally considered by those firms in setting fees. The aforesaid time records show that to February 8, 1974, the following recorded hours, by categories of partner, associate and paralegals respectively have been spent by plaintiffs' counsel on this case:

| | |
|---|---|
| Partners | 7,854.8 |
| Associates | 8,271.45 |
| Paralegals | 417.3 |
| | 16,543.55 |

Of the time spent by Holland & Hart, partners in this litigation, Mr. Westfeldt spent 2,176.4 hours, Mr. Kahn 1,505 hours, Mr. Hobson 205. hours, Mr. Sattler 443.9 hours, Mr. Palmer 329. hours, Mr. Mayne 931.3 hours, all hours computed through January 31, 1974.

Mr. Patrick, plaintiffs' lead counsel, spent 1,314.8 hours on this litigation through February 8, 1974.

Messrs. Scott, Brown, and Kirkley spent respectively 2,248, 254 and 4,894 hours on the litigation through February 8, 1974.

Messrs. Fine and Susman on behalf of plaintiff-intervenor spent 250 hours.

One of the factors relevant to the award is the time necessarily spent on the case by counsel.

Through February 8, 1974, plaintiffs' counsel have expended in excess of 16,000 hours of lawyer's time in the action, approximately one-half of these

hours having been expended by partners, and the remainder by associates. More than 400 hours have been expended by paralegals. The use of paralegals is to be encouraged in complex litigation. *See, e. g.,* Pacific Coast Agric. Export Ass'n. v. Sunkist Growers, Inc., 1973 Trade Reg.Rep. ¶ 74,523 (N.D.Cal.1973).

A minimum of 2,000 additional hours, and more probably an additional 4,000 hours of lawyer's time, will necessarily have to be devoted to this action by plaintiff's counsel in connection with the administration of the settlement, claims processing, and administration, investment and distribution of the settlement proceeds. We are informed that plaintiffs' counsel will not seek additional compensation.

In view of the complexity and magnitude of this litigation and the magnitude of the recovery, the total time already devoted and to be devoted to this action in the future by plaintiffs' counsel is entirely reasonable, necessary, has benefitted and will benefit the class.

■ The fee requested represents approximately $190 per hour of the total lawyer's time devoted and to be devoted by plaintiffs' counsel, from the beginning to the conclusion of this action. In light of other relevant factors, discussed hereinbelow, the Court finds that the allowance per hour requested by plaintiffs' counsel is reasonable.

However, an hourly rate, while a consideration, is not a very realistic yardstick to determining attorney fees in complex litigation where an extremely large recovery is achieved and attendant circumstances found in this litigation.

## V. ADVANCE FEE ARRANGEMENTS, IF ANY, BETWEEN COUNSEL AND MEMBERS OF THE CLASS.

Affidavits relating to the fee arrangements with clients in various types of litigation have been filed by Messrs. Westfeldt, Patrick and Scott.

These affidavits specify the hourly rates on non-contingent legal matters charged by them personally and members of their firms.

Representation by plaintiffs' and intervenor's counsel in this litigation was purely on a contingent basis.

Mr. Westfeldt's affidavit (filed February 13, 1974) states in part:

". . . that neither he nor his firm would have undertaken representation of plaintiff and the class . . . on a purely contingent basis if there had been any thought that the hourly rates . . . would be used as the basis for the fees to be awarded by the Court. . . ."

All affidavits emphasize that representation by counsel would have never been undertaken if remuneration would be based on hourly rates of pay.

## VI. PUBLIC POLICY CONSIDERATIONS.

■ In awarding attorney fees in a class action, the Court is charged with the duty of being fair to class members who are viable litigants, non-appearing class members, and the attorneys whose efforts and professional abilities have produced the recovery.

■ A proper balance must be struck which takes into account public policy considerations. The allowance must be sufficiently generous, in those cases in which a recovery is effected, to encourage competent counsel to accept representation in these private actions, which vindicate the Congressional purposes of the federal securities laws and the federal antitrust laws. The allowance of fees should have for a consideration sufficient incentive to competent counsel to remain in the field of public interest litigation. As the Court of Appeals for the Second Circuit stated in Grace v. Ludwig, 484 F.2d 1262, 1267 (2d Cir. 1973):

"At the heart of the doctrine favoring the award of counsel fees in secu-

rities cases is the need to encourage the vigilance of private attorneys general to provide corporate therapy protecting the public investor who might otherwise be victimized. See Rosenblatt v. Northwest Airlines, Inc., 435 F.2d 1121, 1124 (2d Cir. 1970). Thus in *Borak* the Court commented upon the practical inability of the SEC to thoroughly and independently examine the veracity of facts set out in proxy materials which, except for private litigant scrutiny, would be undetected until after a merger had been accomplished. J. I. Case Co. v. Bora, *supra*, 377 U.S. [426] at 432–433, [84 S.Ct. 1555, 12 L.Ed.2d 423]."

In Mills v. Electric Auto-Lite Co., 396 U.S. 375, 396, 90 S.Ct. 616, 628, 24 L. Ed.2d 593 (1970), the Supreme Court made a comment particularly pertinent to the facts of the present case:

> "[P]rivate stockholders' actions of this sort 'involve corporate therapeutics' and furnish a benefit to all shareholders . . ."

In awarding counsel fees in successful actions, we recognize that unless competent attorneys are encouraged by adequate awards to undertake representation of this kind, the interests of minority stockholders would often be left without any protection.

As a practical matter, this action could only have been brought as a class action. It would have been extremely burdensome for a few individuals to finance and carry on such litigation. Out-of-pocket expenses alone have to date exceeded $100,000. No competent attorney would have agreed to handle this case for any individual client for a contingent fee of 18 percent (18%) of any recovery effected.

If this were not a class suit, but had been brought solely for the named plaintiffs, the proposed settlement would have resulted in a modest recovery for named plaintiffs. The recovery perhaps would have been drastically reduced by out-of-pocket expenses. Had plaintiffs' counsel represented plaintiffs as individuals, pursuant to conventional non-contingent fee arrangements, such fees and the out-of-pocket expenses would have more than consumed any recovery. Had competent and dedicated counsel not represented the class, recovery in any amount was highly problematical.

## VII. EXTENT AND BASIS OF OBJECTIONS TO ALLOWANCE OF ATTORNEY FEES

As alluded to before, no objections to the requested fee of 18 percent (18%) have been voiced in writing or otherwise by any shareholder.

## LEGAL PRINCIPLES

### I.

■■■ Rules 23.1 and 23 of the Federal Rules of Civil Procedure are designed in part to permit claimants with a small loss to assert valid claims which they could not otherwise afford to litigate. *See, e. g.,* Hawaii v. Standard Oil Co. of California, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); Weeks v. Bareco Oil Co., 125 F.2d 84, 90 (7th Cir. 1941); and Escott v. Barchris Constr. Corp., 340 F.2d 731, 733 (2d Cir.), cert. denied sub nom. Drexel & Co. v. Hall, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965). In securities cases if the stockholder-plaintiff is to obtain the services of an attorney, it must normally be on a contingent fee basis. Claimants with a small loss could not otherwise afford to litigate.

### II.

■■■ The trial court has reasonable discretion in setting the amount of attorneys' fees in a class action suit, subject to reversal on appeal only when an abuse of that discretion is shown. The trial court's appraisal of the quality and value of legal services will ordinarily not be disturbed. Lindy Bros. Bldrs., Inc. v. American Radiator & Std. Sanitary Corp., 487 F.2d 161, 166 (3d Cir. 1973);

Milwaukee Towne Corp. v. Loew's, Inc., 190 F.2d 561, 571 (7th Cir. 1951); Hanover Shoe, Inc. v. United Shoe Mach. Corp., 245 F.Supp. 258, 302 (M.D.Pa. 1965), rev'd on other grounds, 377 F.2d 776 (3d Cir. 1967), aff'd in part and rev'd in part on other grounds, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); Noerr Motor Freight, Inc., v. Eastern R.R. Pres. Conf., 166 F.Supp. 163, 168 (E.D.Pa.1958), aff'd 273 F.2d 218 (3d Cir. 1959), rev'd on other grounds, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

■ Many cases note that in setting attorneys' fees in class actions the amount of time spent by the attorneys is one of the factors to be considered. United States v. Local 3, IUOE, 6 FEP Cas. 984, 986 (N.D.Cal.1973); Illinois v. Harper & Row Publishers, Inc., supra; Paris v. Metropolitan Life Ins. Co., 94 F.Supp. 356, 358 (S.D.N.Y.1950).

In reviewing the District Court's allowance of attorneys' fees in Lindy Brothers Builders, supra, the Third Circuit considered the time spent by the attorneys involved and pointed to the necessity for complete documentation of the time expended. 487 F.2d at 167. Documentation of services rendered and work performed by counsel has been filed in this action and we are satisfied with the sufficiency of the documentation.

■ A number of factors, other than time, must be considered in determining the value of the legal services rendered in this action. In valuing the services of attorneys in class action suits, courts have considered such things as the attorneys' normal billing rates, fees customarily charged by other attorneys in the vicinity for similar services, and the prevailing hourly rates for attorneys of different degrees of skill, experience and standing. See, e. g., Lindy Bros. Bldrs., Inc. v. American Radiator & Std. Sanitary Corp., supra, 487 F.2d at 167; Local Union No. 3, supra, 6

FEP Cas. at 986; and Perlman v. Feldmann, supra, 160 F.Supp. at 311.

■ Additionally, the allowable billing rate may be affected by the legal reputation or status of the attorneys involved and by their eminence in a particular field. Lindy Bros. Bldrs., Inc. v. American Radiator & Std. Sanitary Corp., supra, 487 F.2d at 167; United States v. Local 3, IUOE, supra, 6 FEP Cas. at 986; Philadelphia Elec. Co. v. Anaconda Amer. Brass Co., supra, 47 F.R.D. at 559; and Illinois v. Harper .& Row Publishers, Inc., supra, 1972 Trade Reg.Rep. at 92,270.

In a few cases, the courts have translated the fee allowed into hourly rates but have awarded fees which represented a multiple of the hourly rate appropriate in routine non-contingent matters. See, e. g., Arenson v. Board of Trade [of the City of Chicago] 372 F.Supp. 1349 (N.D.Ill., 1974) (Bauer, J.), awarding aggregate attorney fees of $1,339,060 computed at four times the normal hourly non-contingent rates charged by plaintiffs' counsel. A settlement was approved which granted equitable relief, rather than a recovery of damages. Judge Bauer, in his opinion, quotes the normal hourly rate charged by plaintiffs' attorneys in non-contingent matters. Plaintiffs' counsel were then awarded fees of four times this hourly non-contingent rate, from a low of $140.00 per hour to a high of $500.00 per hour. The fees awarded by Judge Bauer, on the average, represented $358.56 per hour for the lawyers' time devoted to the action. The opinion refers to court awards of fees in other antitrust cases in which higher hourly rates were awarded.

Philadelphia v. Charles Pfizer & Co., 1972 Trade Reg.Rep. ¶ 74,033 (S.D.N.Y. 1972), is a case settled prior to trial, in which District Judge Inzer B. Wyatt allowed a $600,000 fee and noted that his award represented compensation to the plaintiff's attorney at a rate of slightly more than $200.00 per hour.

In Philadelphia v. American Oil Co., Civil No. 647–68 (D.N.J., filed June 23, 1973), District Judge Augelli awarded fees representing more than $500.00 per hour.

A number of courts have mentioned the "novelty and difficulty" of the legal issues involved in the case as a factor to be considered in setting appropriate fees, United States v. Local 3, IUOE, *supra*, at 986 and Illinois v. Harper & Row Publishers, Inc., *supra*, 1972 Trade Reg. Rep. at 92,270; and at least one court considered this factor to be of major importance in fixing the attorneys' award. Trans World Airlines, Inc. v. Hughes, *supra*. See also Kiser v. Miller, 364 F. Supp. 1311 (D.D.C.1973); Milwaukee Towne Corp. v. Loew's, Inc., *supra*, 190 F.2d at 570.

■■■ One of the factors which contributes to the trial court's evaluation of the value of the attorneys' services is the quality of the work which the judge has observed. Lindy Bros. Bldrs., Inc. v. American Radiator & Std. Sanitary Corp., *supra*. *Accord*, Freeman v. Ryan, 133 U.S.App.D.C. 1, 408 F.2d 1204, 1206 (D.C.Cir. 1968).

### III.

■■■ In evaluating the services rendered in this case, appropriate consideration must be given to the risks assumed by plaintiffs' counsel in undertaking the litigation. The prospects of success were by no means certain at the outset, and indeed, the chances of success were highly speculative and problematical. As mentioned before, plaintiffs' counsel did not have the assistance of prior (or contemporaneous) governmental proceedings. Accordingly, the entire burden of (a) developing the facts, (b) developing viable and probable theories for recovery and (c) the management and organization of a complex case with a myriad of documents and depositions was borne by plaintiffs' counsel.

We have accorded considerable weight to the outstanding reputation, great ability and high standing of attorneys for plaintiffs in this action and the formidability of opposing counsel.

[20] We also have given consideration to the fact that the services performed in this case were performed under very great and continuing pressures of time by plaintiffs' counsel. Pressures of time and travel involved not only personal inconvenience, but make it difficult for the attorneys to maintain any normal client relationships with regular clients. Indeed, this case was a career case for several of plaintiffs' counsel and monopolized their professional time for over a period of months.

As mentioned above, in class actions of this type which result in a recovery, the Court may properly take into account the fact that one purpose of the allowance is to encourage competent, experienced attorneys to be willing to undertake representation of a class in a civil action, brought to enforce the securities and antitrust laws of the United States. *See* Smolowe v. Delendo Corp., 136 F.2d 231, 241 (2d Cir.) cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943); Dolgow v. Anderson, 43 F.R.D. 472, 494 (E.D.N.Y.1968); Rosenfeld v. Black, 56 F.R.D. 604 (S.D.N.Y.1972). *See also,* Hornstein, The Counsel Fee in Stockholder's Derivative Suits, 39 Colum.L.Rev. 784, 815 (1939).

### IV.

Our research reflects that fee allowances in class actions brought under the federal securities laws have traditionally ranged from 20 percent (20%) to 30 percent (30%) of the recovery effected for the class. *See, e. g.,* Rosenfeld v. Black, *supra.* Fees in that general range have been allowed, even where very large recoveries have been effected, where warranted by the circumstances of the particular case and by the magnitude and quality of counsel's legal serv-

ices. *See, e. g.,* Philadelphia Elec. Co. v. Anaconda Amer. Brass Co., *supra,* 47 F. R.D. at 559; Lehigh Valley R. R. v. Peaslee, 47 F.Supp. 55 (E.D.Pa.1942); Philadelphia v. American Oil Co., *supra.* The fees awarded in this litigation are in the lower range of awards in class actions involving substantial recoveries.

## V.

Our study of opinions of the Court of Appeals for the Tenth Circuit reveals that fees ranging from 15 percent to 50 percent of substantial recoveries have been affirmed. Simler v. Conner, 352 F.2d 138 (10th Cir. 1965), cert. denied, 383 U.S. 928, 86 S.Ct. 931, 15 L.Ed.2d 846 (1966); Continental Baking Co. v. Old Homestead Bread Co., *supra;* Hanna Paint Mfg. Co. v. Rodey, Dickason, Sloan, Akin & Robb, 298 F.2d 371 (10th Cir. 1962); United States v. Anglin & Stevenson, 145 F.2d 622 (10th Cir. 1944), cert. denied, 324 U.S. 844, 65 S. Ct. 678, 89 L.Ed. 1405 (1945); and Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10th Cir. 1961), appeal dismissed, 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962). See also Wewoka v. Banker, 117 F.2d 839 (10th Cir. 1941), approving an award of attorneys' fees out of funds successfully protected for the benefit of municipal district improvement bonds.

## VI.

The provisions in the Code of Professional Responsibility relating to fee matters are DR 2-106 and EC 2-18. Other considerations for the assessment of attorneys' fees in class actions are set out in the Manual for Complex Litigation § 1.47 (West, 1973). The following law review articles deal with awards of attorneys' fees in class actions: Hornstein, Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards, *supra,* 69 Harv.L.Rev. at 660-61; Hornstein, New Aspects of Stockholders' Derivative Suits, 47 Colum.L.Rev. 1 (1947); Hornstein, Problems of Proce-

dure in Stockholder's Derivative Suits, 42 Colum.L.Rev. 574 (1942); Hornstein, The Counsel Fee in Stockholder's Derivative Suits, *supra.* Professor Hornstein's articles have been cited with approval by a great number of courts, including the United States Supreme Court in Mills v. Electric Auto-Lite Co., *supra,* 396 U.S. at 394, 396, 90 S.Ct. 616. Dole, The Settlement of Class Actions for Damages, 71 Colum.L.Rev. 971 (1971); Haudek, The Settlement and Dismissal of Stockholder's Actions, 23 Sw.L.J. 765, 792-801 (1969); Kalven & Rosenfield, The Contemporary Function of the Class Suit, 8 U.Chi.L.Rev. 684 (1941); Nussbaum, Attorney's Fees in Public Interest Litigation, 48 N.Y.U.L.Rev. 301 (1973). *See also* Annot., Attorneys' Fees in Class Actions, 38 A.L.R.3rd 1384 (1971).

## AWARD OF ATTORNEY FEES AND REIMBURSEMENT OF EXPENSES

### I.

After taking all circumstances into consideration, plaintiffs' and plaintiff-intervenor's counsel are entitled to receive and are awarded as legal fees for their legal services on behalf of the class and intervenor in this action, the sum of $1,548,000 in cash plus 26,266 shares of Standard stock (plus any net income which may accrue with respect to said sum of cash and said shares prior to distribution thereof to counsel) out of the recovery realized on behalf of the class and intervenor pursuant to the settlement of this action.

The settlement realized in this litigation is of considerable precedence. Plaintiffs' and intervenor's counsel have assiduously, consistently and indefatigably protected the rights of the class. The settlement was not easily attained. The class members have been immeasurably and financially benefitted from the services rendered by counsel. The services were of the highest and conscien-

tious order. The award, while substantial, is reasonable, fair and rightfully deserved.

Pursuant to the Settlement Agreement 10.5% of the total legal fees and disbursements awarded hereby shall be charged against, and paid out of, the shares of Standard stock to be issued to present shareholders of Midwest in connection with the merger of Midwest with a subsidiary of Standard to be effected as part of the settlement, heretofore approved by this Court's FINAL JUDGMENT APPROVING THE SETTLEMENT, entered February 22, 1974.

The remainder of said fees and disbursements shall be charged ratably against, and paid pursuant to further Order of this Court out of, the recovery effected pursuant to the settlement for persons who tendered, exchanged or sold Midwest shares on the open market whose claims are approved by the Court.

To summarize, we have computed the attorney fees as follows: The recovery effected as a clear benefit to the class includes in cash: approximately $7,000,000 for persons who tendered Midwest stock in early 1971, and approximately $1,600,000 for persons who sold on the open market during the class period. Thus, the cash recovery against which any percentage should be applied is approximately $8,600,000. (See *Settlement* Paragraph I and footnotes therein above).

As shown in the footnotes to our section on Settlement, 114,072 additional shares of Standard stock are to be issued to persons who exchanged their Midwest stock for stock of Standard in early 1972. Another 31,850 additional shares of Standard stock are to be issued to present holders of Midwest stock in the proposed merger over and above the 1.68 shares of Standard which would have been issued for each share of Midwest under the merger ratio proposed and approved in 1971. Thus, the net incremental share recovery against which

any percentage should be applied is 145,922 shares of Standard stock.

Applying an 18 percent (18%) figure to the cash and the incremental shares recovered results in a fee award of $1,548,000 in cash plus 26,266 shares of Standard stock.

## II.

The foregoing award of fees and disbursements shall constitute the full allowance to be made for legal services rendered and disbursements made on behalf of the class in this action. It shall be deemed to compensate plaintiffs' counsel in full for all their services in connection with this action, including such services as they have undertaken to render but have not yet rendered in connection with the administration of the settlement, the processing and verification of claims, the administration and investment of the proceeds of the settlement pending distribution, and effecting distributions to be made to class members. Nothing herein shall be construed as in any way affecting the obligations which Standard has undertaken to render (but has not yet rendered) in connection with said administration, processing and verification, investment and distributions.

The award shall be disbursed and paid over to plaintiffs' counsel at such time or times, in such amounts and in such manner as this Court may by further order direct, and said award shall not be deemed to have been paid or received by said counsel as fees and as reimbursement of disbursements until actually received by them pursuant to further order of the Court.

## III.

Plaintiffs' counsel have expended in excess of $100,000 in out-of-pocket disbursements, (closer to $150,000), in connection with this action. These disbursements are documented and were necessary to this litigation. The disbursements have benefitted the class and

were necessarily expended in order to achieve the recovery effected. Itemization of requested reimbursement for out-of-pocket expenses has been reviewed by the Court.

■ The law firms of Berkowitz, Lefkovits & Patrick of Birmingham, Alabama; Holland & Hart of Denver, Colorado; and Brown, Herman, Scott, Dean & Miles of Fort Worth, Texas (said firms being collectively referred to herein as "plaintiffs' counsel"), are entitled to receive, and hereby awarded the sum of $100,000 (plus any net income which may accrue with respect thereto prior to distribution thereof to said counsel) out of the recovery effected for the class pursuant to the settlement of this action, as reimbursement for out-of-pocket monies necessarily and reasonably expended by them on behalf of the class in connection with this action.

## IV.

In the application for attorney fees, plaintiffs' and intervenor's counsel have specifically stated that the allowances sought would cover any further attorney's time and out-of-pocket expenses to be incurred in connection with the administration of the settlement and processing of claims, and like matters in this case expended on behalf of the class. Similarly, although their out-of-pocket expenses already exceeded $100,000, plaintiffs' counsel have stated that they will bear the further expense and not seek reimbursement for any additional out-of-pocket expenses necessarily incurred in connection with their activity on behalf of the plaintiffs and the class herein. Accordingly, in making this award, we have taken into account the further undertakings of plaintiffs' counsel as described above and the award is intended to and will be the sole award to plaintiffs' and intervenor's counsel in this action; there will be no additional allowance for reimbursement for expenses.

## V.

Counsel for plaintiffs are directed to prepare a judgment awarding attorney fees and expenses as reflected herein; also apportioning attorney fees for plaintiffs' counsel and for plaintiff intervenor according to their agreement filed previously; all in accordance with the provisions of Rule 54(b) of the Federal Rules of Civil Procedure. Said judgment shall be filed expeditiously.

The Court expressly retains jurisdiction to construe, administer and enforce the settlement in accordance with its Final Judgment entered herein February 22, 1974, including the allowance and disallowance of claims filed herein by members of the class, and expressly retains jurisdiction to construe, administer and enforce the provisions of this Order and Final Judgment entered herein.

The award of attorney fees in the instant case is decided on the totality of the circumstances of the case and the uniqueness of the litigation and is not precedent for other awards of attorney fees in other class actions. The ruling is limited to the facts of this case.

This opinion contains and shall constitute the findings of fact and conclusions of law required by Rule 52, Federal Rules of Civil Procedure.

## OPINION APPROVING SETTLEMENT

In accordance with Rules 23(e) and 23.1 of the Federal Rules of Civil Procedure, this matter was heard on 11 February 1974 pursuant to notice to plaintiffs, plaintiff-intervenor, members of the plaintiff class, defendant Standard Oil Company (Indiana) (hereafter "Standard"), and nominal defendant Midwest Oil Corporation (hereafter "Midwest"), to determine the fairness, reasonableness, and adequacy of the proposed settlement and compromise of this action embodied in the Memorandum of Agreement Regarding Settlement of Midwest Litigation (hereafter "Settle-

ment Agreement"), a copy of which is appended hereto as Appendix A.

The Court having considered all testimony, affidavits, depositions, exhibits, and arguments submitted in connection with the Settlement Agreement; the Court having heard from all interested persons who appeared at the hearing or who made written submissions to the Court; the Court having considered the one objection filed with the Court; and the Court being fully advised in the premises, the Court makes the following findings of fact and conclusions of law which shall constitute the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure:

1. The original complaint in this action was filed on 23 September 1971. As subsequently amended, and as made more definite during pretrial proceedings, plaintiffs' principal claims were that plaintiffs and other shareholders of Midwest who had held Midwest shares since 1 January 1971 had been injured by reason of defendant Standard's alleged violations of §§ 10(b) and 14(e) of the Securities Exchange Act and Rule 10b–5 of the Securities and Exchange Commission. More specifically, plaintiffs made the following separate claims:

a) That Midwest shareholders who tendered their Midwest stock for $105 pursuant to the Midwest Invitation for Tender dated 15 January 1971 had allegedly been damaged by reason of asserted misrepresentations and non-disclosures of material facts in connection with the Tender Offer, for which Standard was liable both directly and indirectly as the controlling stockholder of Midwest under § 20 of the Securities Exchange Act;

b) That Midwest shareholders who had sold their Midwest shares in the open market on or after 1 January 1971 had also been allegedly damaged by reason of asserted misrepresentations or non-disclosures of material

facts on the part of Standard, either directly or indirectly through its control of Midwest;

c) That Midwest shareholders who had exchanged their Midwest shares pursuant to Standard's Exchange Offer Prospectus, dated 2 March 1972, at a ratio of 1.68 Standard shares for one Midwest share, had allegedly been damaged by reason of Standard's asserted misrepresentations and non-disclosures of material facts in connection with the Exchange Offer; and

d) That present Midwest shareholders had allegedly suffered damages and diminution in the value of their Midwest stock by reason of Standard's alleged conduct.

2. In addition to claims asserted under the federal securities laws, plaintiffs asserted various claims on behalf of present and former Midwest shareholders for alleged common law fraud and other wrongs on the part of Standard. Plaintiffs also asserted claims derivatively on behalf of Midwest for Standard's alleged violations of the federal antitrust laws and for its alleged breaches of fiduciary, contractual, and other duties owed to Midwest.

3. On 11 February 1972 Edmund A. Spencer, a Midwest minority shareholder, moved for leave to intervene as a plaintiff in the action. This motion was stipulated to by plaintiffs, and no objection being raised by defendant Standard or nominal defendant Midwest, the motion was granted by this Court's Order dated 30 March 1972.

4. On 18 May 1972 this Court determined that the action should proceed as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all Midwest shareholders (other than Standard) on or after 1 January 1971. Pursuant to this Court's Orders of 18 May 1972, 10 October 1972, and 12 December 1972, a list of all class members was compiled and individual notice was mailed to each of them in December

1972. The notice advised class members of the pendency and nature of the action and informed them that their interests in the action would be represented by the named plaintiffs unless they filed a timely request for exclusion or asked to be represented by their own counsel. Approximately 1700 present or former Midwest shareholders requested exclusion from the class.

5. From the outset of the litigation, the case has been vigorously pressed by plaintiffs, and vigorously defended by Standard. The parties have taken 54 depositions on oral or written questions, have filed ten sets of interrogatories, and have made numerous formal and informal requests for documents. The parties have also extensively briefed and argued motions and cross-motions for summary judgment, for judgment on the pleadings, and for other legal rulings. The docket entries in the action total in excess of 490 separate items.

6. From time to time the parties have met and explored the possibilities of settlement of the action, in some instances at the Court's direction. Commencing late in 1973, serious and protracted negotiations began, and on 2 January 1974 counsel for all parties presented the appended Settlement Agreement in open Court. By agreeing to the proposed settlement, Standard does not admit and on the contrary expressly denies that it has violated any provisions or obligations of federal or state law. In brief, the Settlement Agreement provided that, subject to approval by the Court and to certain adjustments described hereafter:

a) Standard shall pay $13 as damages for each Midwest share tendered pursuant to the Midwest Invitation for Tender dated 15 January 1971, by persons who file proofs of claim which are allowed by the Court;

b) Standard shall pay $6 as damages for each Midwest share held of record (directly or by nominee) on or after 1 January 1971 and sold on the open market prior to 29 December 1973, by persons who file proofs of claim allowed by the Court;

c) Standard shall issue as an adjustment in the exchange ratio provided in the Standard Exchange Offer dated 2 March 1972 an additional 0.22 shares of Standard common voting stock for each Midwest share exchanged pursuant to said Exchange Offer, by persons who file proofs of claim allowed by the Court;

d) Midwest shall be merged with a subsidiary of Standard as promptly as possible after Court approval of the Settlement Agreement, pursuant to a plan of merger whereby Standard shall issue 1.93 shares of Standard common voting stock for each Midwest share held of record as of the effective date of the merger by persons other than Standard; and

e) This action and the Complaint as amended from time to time shall be dismissed with prejudice and without costs as to each and every claim asserted herein or which might have been asserted herein (whether direct, individual, class, derivative, or otherwise), including any and all claims with respect to the merger provided for in subparagraph d) above.

7. The Settlement Agreement provided that in the event the closing price of Standard common stock traded on the New York Stock Exchange on the last business day preceding the hearing scheduled for 11 February 1974 should exceed $105, (a) the number of Standard shares to be issued for each Midwest share pursuant to subparagraph 6–c) above should be 0.22 multiplied by $105 and divided by such closing price, and (b) the number of Standard shares to be issued for each Midwest share pursuant to subparagraph 6–d) above should be 1.93 multiplied by $105 and divided by such closing price. The Settlement Agreement provided that in the event the closing price of Standard common

stock traded on the New York Stock Exchange on the last business day preceding said hearing should be less than $95, (a) the number of Standard shares to be issued for each Midwest share pursuant to subparagraph 6–c) above should be 0.-22 multiplied by $95 and divided by such closing price; and (b) the number of Standard shares to be issued for each Midwest share pursuant to subparagraph 6–d) above should be 1.93 multiplied by $95 and divided by such closing price. The closing price of Standard common stock on 8 February 1974, the last business day prior to the 11 February 1974 hearing, was in fact 90⅜ per share, and the number of Standard shares to be issued for each Midwest share pursuant to subparagraphs 6–c) and d) above is accordingly 0.231 and 2.-029 respectively.

8. The Settlement Agreement also required Standard to cause a registration statement to be filed with the SEC and to become effective for such shares of its common voting stock as may be issued to effectuate the proposed settlement, including the proposed merger, or to obtain a no-action letter from the staff of the Securities and Exchange Commission indicating that the staff will recommend no action in the event such Standard shares are hereafter sold by the recipients of such shares pursuant to the proposed settlement, including counsel for plaintiffs. Standard has obtained such a no-action letter from the Securities Exchange Commission, dated 7 February 1974.

9. The Settlement Agreement further provided that counsel for plaintiffs and the plaintiff class should be entitled to apply for and receive such reasonable allowances for their legal services and out-of-pocket disbursements in connection with this litigation as this Court might order.

10. Pursuant to this Court's Order of 4 January 1974, individual notice was mailed on 8 January 1974 to all class members whose names and addresses could reasonably be ascertained, as well as to all persons who had excluded themselves from the class, advising them of the terms of the Settlement Agreement and that a hearing would be held on 11 February 1974 at 10:00 a. m. in the United States Courthouse, Denver, Colorado, on the fairness, reasonableness, and adequacy of the terms and conditions of the Settlement Agreement, including the proposed issuance and exchange of Standard voting common stock, and to determine whether the Court should enter a final judgment dismissing this action. The notice contained instructions regarding the filing of claims. It also advised that the Court would consider the applications of plaintiffs' attorneys for awards of fees and expenses at the 11 February 1974 hearing and stated the awards requested. The notice invited all interested parties to appear at the hearing. In addition to the mailed notice, copies of the notice were published on 9 and 16 January 1974 in the national edition of the Wall Street Journal. The Court finds that the above notice satisfied the requirements of Rules 23(e) and 23.1 and the requirement of due process.

11. At the hearing on 11 February 1974 the Court heard oral testimony in support of the fairness of the terms and conditions of the Settlement Agreement from W. Ashton Lee, a class member and former Financial Vice President of Midwest; Frank R. Isenhart, Jr., Executive Vice President of First Trust Corporation; James S. Marcus, a partner of Goldman, Sachs & Company; Robert F. Greenhill, a partner of Morgan Stanley & Company; and Dr. Eugene F. Fama, Professor of Finance at The University of Chicago, and a statement of James C. Owen, Jr., Esq., on behalf of Arthur E. Johnson, former Chairman of Midwest. The Court's attention was also directed to the deposition testimony of a number of witnesses, the transcripts of which had been previously filed with the Court, and to various documentary ex-

hibits. In addition, the Court received and considered the affidavits of the Continental Oil Company by Bert L. Waggoner, Chief Reservoir Engineer; the Atlantic Richfield Company by Dr. Howard A. Koch, Manager of the Engineering Department; Raymond F. Kravis, President of Raymond F. Kravis and Associates; and DeGolyer and Mac-Naughton by James R. Curry, Senior Vice President, in support of the settlement. The Court further considered the joint brief filed by plaintiffs and defendants as well as the arguments and other matters presented in the many hearings, briefs, pleadings, and other papers filed in this case. The Court also considered the objection of Robert G. Clark, III, which is dealt with more specifically hereinafter. It should be noted that the Court has actively presided over all facets of this case since November, 1971, and is acquainted with the legal and factual issues inherent in the litigation.

■ 12. Rules 23(e) and 23.1 of the Federal Rules of Civil Procedure provide that an action brought under these rules "shall not be dismissed or compromised without the approval of the court". Under those rules, the authority to approve a settlement of a class or derivative action is committed to the sound discretion of the trial court. State of West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710, 740 (S.D.N.Y.1970), aff'd 440 F.2d 1079 (2 Cir. 1971), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); 3B Moore's Federal Practice, § 23.80[4].

The scope of judicial review is well stated by Judge Wyatt in State of West Virginia v. Chas. Pfizer & Co., *supra*, 314 F.Supp. 710 at 740:

"Whether to approve the compromise involves an exercise of discretion. The Court is responsible for the protection of the many class members whose interests are involved but who do not appear in the action. Approval should be given if the settlement offered is fair, reasonable and adequate. These terms are general and cannot be measured scientifically.

"The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement. This factor is sometimes referred to as the likelihood of success. The Supreme Court directs the judge to reach 'an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated' and to 'form an educated estimate of the complexity, expense, and likely duration of such litigation, . . . and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise'. The Supreme Court then emphasizes: 'Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.' The quotations are from Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424–425, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968)" [314 F.Supp. at 740–741].

■ Within judicial discretion, the well-settled rule is that a settlement should be approved if it is fair, reasonable, and adequate. State of West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710, 740 (S.D.N.Y.1970); Neuman v. Electronic Specialty Co., 1970–71 Fed. Sec.L.Rep. § 92,955 (N.D.Ill.1971).

Settlements were approved in the following class action cases: State of West Virginia v. Chas. Pfizer & Co., 314 F. Supp. 710, 741–748 (S.D.N.Y.1970), aff'd 440 F.2d 1079 (2d Cir. 1971), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L. Ed.2d 115 (1971); Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 322 F.Supp. 834 (E.D.Pa.1971), modified and aff'd. Ace Heating & Plumbing Co. v. Crane Co., 453 F.2d 30 (3d Cir. 1971); Cannon v. Texas Gulf Sulphur Co., 55 F.R.D. 308

(S.D.N.Y.1972); Feder v. Harrington, 58 F.R.D. 171 (S.D.N.Y.1972); In re Four Seasons Securities Laws Litigation, 58 F.R.D. 19 (W.D.Okla.1972); In re Brown Company Securities Litigation, 355 F.Supp. 574 (S.D.N.Y.1973); City of Detroit v. Grinnell Corp., 356 F.Supp. 1380 (S.D.N.Y.1972). Approval was denied in Norman v. McKee, 431 F.2d 769 (9th Cir. 1970) and in In re International House of Pancakes Franchise Litigation (W.D.Mo., filed 12 July 1973).

Precedents in this field are collected and thoroughly discussed in Haudek, The Settlement and Dismissal of Stockholder's Actions, 23 Sw.L.J. 765, 792–801 (1969); Dole, Settlement of Class Actions for Damages, 71 Colum.L.Rev. 971 (1971).

■ 13. In assessing the fairness, reasonableness, and adequacy of a proposed settlement, the Court should "compare the terms of the compromise with the likely rewards of litigation". Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 425, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968), reh'g denied, 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425. This comparison requires consideration of two main elements. First, although the court need not, and should not, decide the merits of the controversy, it should consider the existence of serious questions of law and fact which place the ultimate outcome of the litigation in doubt:

> Of course, the approval of a proposed settlement does not depend on establishing as a matter of legal certainty that the subject claim or counterclaim is or is not worthless or valuable. The probable outcome in the event of litigation, the relative advantages and disadvantages are, of course, relevant factors for evaluation. But the very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a rec-

ognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty. Parties would be hesitant to explore the likelihood of settlement apprehensive as they would then be that the application for approval would necessarily result in a judicial determination that there was no escape from liability or no hope of recovery and hence no basis for a compromise. Florida Trailer and Equipment Company v. Deal, 284 F.2d 567, 571 (5th Cir. 1960).

Second, the Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, "It has been held proper 'to take the bird in the hand instead of a prospective flock in the bush.'" State of West Virginia v. Chas. Pfizer & Co., supra, 314 F.Supp. at 743. Accord, e. g., Protective Committee v. Anderson, supra, 390 U.S. at 424, 88 S.Ct. 1157; Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 322 F.Supp. 834, 838 (E.D.Pa. 1971), modified and aff'd, 453 F.2d 30 (3d Cir. 1971).

■ 14. In applying the above tests to a proposed settlement, the Court should also consider the judgment of counsel and the presence of good faith bargaining between the contending parties. See, e. g., Neuman v. Electronic Specialty Co., supra, at p. 90,516. Courts have consistently refused to substitute their business judgment for that of counsel, absent evidence of fraud or overreaching:

> "The Court will not substitute its business judgment for that of the parties; 'the only question * * * is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval'."

Zerkle v. Cleveland-Cliffs Iron Co., 52 F.R.D. 151, 159 (S.D.N.Y.1971) (emphasis in original). Accord, Schleiff v. Chesapeake and Ohio Railway Company, 43 F.R.D. 175, 178 (S.D.N.Y.1967).

15. In light of the foregoing, the Court, in assessing the fairness, reasonableness, and adequacy of the Settlement Agreement, has compared the results achieved by the settlement with the plaintiffs' chances of success in litigating the substantial, complex, and sharply contested legal and factual issues involved in this case. These issues, as distilled by the Court from the June 20, 1973 Pretrial Order and from the parties' Statements of the Issues filed herein, included, but were not limited to, the following:

a) Whether the alleged non-disclosures and misrepresentations were of matters of fact or only of opinions, and if matters of fact, whether they were material to the investment decisions of plaintiffs and the plaintiff class. *See e. g.,* In the Matter of Brown Company Securities Litigation, 1972–73 Fed.Sec.L. Rep. ¶ 93,751 at p. 93,276 (S.D.N.Y. 1973).

b) Whether plaintiffs and members of the plaintiff class were required by law to establish and could establish: (1) that they relied on the misrepresentations alleged, and (2) that there was a causal connection between the asserted misrepresentations and non-disclosures and their claimed injury. Compare Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) with Mitchell v. Texas Gulf Sulphur, 446 F.2d 90 (10th Cir. 1971) and Vincent v. Moench, 473 F.2d 430 (10th Cir. 1973).

c) Whether plaintiffs and the plaintiff class could establish any damage from the alleged misrepresentations and non-disclosures and, if so, what is the appropriate measure of such damages. Compare Mitchell v. Texas Gulf Sulphur, *supra,* with Janigan v. Taylor, 344 F.2d 781 (1st Cir. 1965).

d) Whether plaintiffs could recover on behalf of tendering shareholders in light of Standard's contention that the allegedly withheld or misrepresented information concerning Midwest's business and properties was disclosed to and considered immaterial by Midwest's independent management and directors, as well as by independent oil investors and evaluators whose conclusions were summarized in the Midwest Invitation for Tender.

e) Whether Standard was liable as a "controlling person" under Section 20(a) of the Securities Exchange Act for the alleged non-disclosures and misrepresentations made by Midwest in the Invitation for Tender and otherwise. Compare Smith v. Bear, 237 F.2d 79 (2d Cir. 1956) with Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967) cert. denied 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143.

f) Whether persons who sold Midwest stock on the open market were entitled to recover anything in view of the fact they did not sell to either Standard or Midwest and in view of the widely varying motivations for their sales.

g) Whether Standard was liable as an investor in Midwest to persons who sold Midwest shares in the open market and, if so, what is the standard and measure of Standard's liability. *See e. g.,* Mitchell v. Texas Gulf Sulphur Co., *supra.*

h) Whether plaintiffs' claims and those of the class were barred by their knowledge either of the asserted fraud, or of facts sufficient to have required further inquiry on their part at the time they tendered or sold their shares. *See e. g.,* Simon v. Merrill Lynch, 1973 Fed. Sec.L.Rep. ¶ 94,058 (5th Cir.); Athas v. Day, 186 F.Supp. 385 (D.Colo.1960).

i) Whether the filing of the complaint and the information given regarding the litigation in the Standard Exchange Offer Prospectus and otherwise put plaintiffs and members of the class on sufficient notice of the asserted fraud to estop any claims of alleged non-disclosure

or misrepresentation in connection with the Exchange Offer. *See e. g.*, Shappirio v. Goldberg, 192 U.S. 232, 241, 24 S. Ct. 259, 48 L.Ed. 419 ·(1904); Mitchell v. Texas Gulf Sulphur Co., *supra.*

j) Whether present shareholders had standing to sue under Section 10(b) of the Exchange Act and Rule 10b-5 and whether they could show any injury. *See e. g.*, Greenstein v. Paul, 400 F.2d 580 (2d Cir. 1968); Dyer v. Eastern Trust and Banking Co., Fed.Sec.L.Rep. ¶ 93,329 at p. 91,774 (D.Me.1971); Emmi v. First-Manufacturers National Bank, Fed.Sec.L.Rep. ¶ 93,330 at p. 91,-784 (D.Me.1971).·

k) Whether one or more claims of the plaintiffs and the plaintiff class were barred by the statute of limitations or by laches. *See e. g.*, Herald Company v. Seawell, 472 F.2d 1081 (10th Cir. 1972).

l) Whether the action could have continued to proceed as a class action. *See e. g.*, Rossin v. Southern Union Gas Co., 472 F.2d 707 (10th Cir. 1973); Robinson v. Penn. Central Company, Fed.Sec.L.Rep. ¶ 93,772 (S.D.N.Y.1973).

m) Whether Section 8 of the Clayton Act could be applied to interlocking directorates between a parent and subsidiary corporation in the circumstances here, and whether the plaintiffs could establish the required probability of a substantial lessening of competition from the acquisition of Midwest by Standard to recover in their derivative action under Section 7 of the Clayton Act. *See e. g.*, United States v. Sears, Roebuck & Co., 111 F.Supp. 614 (S.D. N.Y.1953); Paramount Pictures Corp. v. Baldwin-Montrose Chemical Co., 1966 Trade Cas. ¶ 71,678 (S.D.N.Y.1966); United States v. Standard Oil Company, 1964 Trade Cas. ¶ 71,215 (N.D.Cal. 1964).

n) Whether plaintiffs could succeed in their other derivative claims given the substantial evidence that the intercorporate relations and dealings between Standard and Midwest were conducted at the equivalent of arms' length negotiations. *See e. g.*, Sinclair Oil Corporation v. Levien, 280 A.2d 717 (Del.1971); Singer v. Creole Petroleum Corp., 301 A.2d 327 (Del.Ch.1973).

o) Whether the alleged misrepresentations and omissions by Standard had any material impact on the market price or market conditions for Midwest stock.

p) Whether Standard prohibited or in any way restricted Midwest in regard to Midwest's exploring for, developing, producing and selling oil and gas outside of the United States and Canada, and if so, to what extent were Midwest's minority shareholders damaged thereby.

q) Whether during 1970 the market for selling Midwest was unfavorable due to high interest rates and other factors.

r) Whether Standard breached any fiduciary duty to the minority stockholders of Midwest.

s) Whether plaintiffs could recover punitive damages for alleged state law violations.

t) Whether any material information concerning Midwest's Salt Creek Field and other properties was concealed or withheld by Standard from Midwest, bidders for Midwest's assets, independent petroleum engineers who evaluated Midwest's assets, or the minority stockholders of Midwest.

u) Whether Standard caused Midwest to purchase all shares tendered, or whether the purchase was unanimously approved by the Midwest board as a matter of their independent judgment.

16. In addition to the uncertainty which the preceding issues raised concerning the ultimate success of plaintiffs and the plaintiff class, the Court has been impressed by the substantial, informed testimony and statements in support of the Settlement Agreement. This included the testimony of the former Financial Vice President of Midwest who in 1971 had vigorously opposed the merger ratio, but who testified that he believed the present settlement is fair,

reasonable, and adequate to the present and former shareholders of Midwest; the testimony of Frank R. Isenhart, Jr., Executive Vice President of First Trust Corporation; and the statement of Attorney James C. Owen, Jr., on behalf of Arthur E. Johnson, former Chairman of Midwest. The Court was also impressed by the expert testimony of Professor Fama and the investment banking firms who detailed the reasons supporting their opinions that the respective elements of the Settlement Agreement afford just compensation to the plaintiffs and members of the plaintiff class.

17. In the Court's scrutiny of the Settlement Agreement and testimony, exhibits, and other relevant data in the court files, it finds that the Settlement Agreement is fair, reasonable, equitable, and adequate.

a) The Court finds that the settlement was arrived at on the basis of good faith bargaining and that plaintiffs and the plaintiff class were represented in the negotiations by counsel who are intimately familiar with the strengths and weaknesses of the case and who are skilled in litigation of the type presented by this action. The Court expressly finds that there is a total absence of collusion between attorneys in formulating the settlement figures and the Settlement Agreement was arrived at in an adversary posture by counsel. The Court is satisfied that the settlement negotiations were conducted in good faith. The Settlement Agreement stands the test of professional.integrity by counsel for plaintiffs' class and intervenor; in like manner defense counsel have been forceful advocates in their client's position in this litigation; they likewise have acted with professional integrity.

b) The Court will not substitute its business judgment for that of the parties. However the Settlement Agreement taken as a whole is extremely fair on its face and is in the best interests of plaintiff class members and intervenor.

c) It is significant that only one shareholder out of thousands filed a written objection to the Settlement Agreement. No objectors appeared at the hearing.

d) In granting or withholding approval a consideration is the overwhelming judgment of the class members. It is apparent, with near unanimity, they approve the Settlement Agreement. All counsel have expressed approval with the Settlement Agreement.

e) The Court has also considered that the Securities and Exchange Commission, Division of Corporation Finance, through their Deputy Chief Counsel, in a letter dated 7 February 1974 (Deft.Ex. 26), stated that "no action" will be taken by the Commission in regard to the securities transaction to be undertaken by defendant (as set forth in the Settlement Agreement). Thus no governmental impediment appears to be present in concluding the securities transaction necessary to effectuate the terms of the Settlement Agreement.

f) The Court also notes that trial of this matter would be lengthy—in excess of a month. Plaintiffs' out-of-pocket costs would be substantial (such costs and out-of-pocket expenditures have exceeded $100,000.00 to date); appeal in several areas is quite likely. Recovery by plaintiffs and intervenor in any amount is not a certainty and in some quarters may be considered problematical. Thus for a totality of reasons expressed herein and based on a common sense and realistic approach, the proposed settlement must be considered fair. Considering the nature of the litigation and all prevailing circumstances, the Court would improperly and, quite likely, detrimentally, jeopardize a substantial recovery by denying approval.

18. Based on the foregoing considerations, the Court finds that the settlement reflected in the Settlement Agreement represents a fair compromise between the competing positions of plaintiffs and the plaintiff class on the one hand, and Standard on the other.

19. As to former Midwest shareholders who tendered their Midwest stock, the Court finds that the additional compensation of thirteen (13) dollars per share of Midwest being paid to them pursuant to the settlement, subject to attorneys' fees and expenses, is fair, reasonable, and adequate, especially in light of the following considerations:

a) The payment is a substantial increment over the price they received in 1971.

b) The price received in 1971 was equivalent to or higher than the highest bid made to Midwest by companies who bid on Midwest assets in 1970.

c) A substantial number of shares were tendered in 1971 at the $105 Tender Offer price by officers and directors of Midwest who were familiar with its financial and operating conditions and its future prospects.

d) The additional compensation takes due account of the derivative and other claims asserted in the Complaint as amended, considering the defenses asserted and the difficulties involved in the litigation of those claims.

20. As to former Midwest shareholders who sold their Midwest stock on the open market, the Court finds that the additional compensation of six (6) dollars per share of Midwest being paid to them pursuant to the Settlement Agreement, subject to attorneys' fees and expenses, is fair, reasonable, and adequate, especially in light of the following considerations:

a) Such persons did not deal directly with Midwest or Standard.

b) Such persons may have had varying motivations for their sales, some of which were wholly unrelated to any conduct by Standard or Midwest as alleged in this action.

c) The payment constitutes a substantial premium over, and is being paid in addition to, any gains achieved by such persons, many of whom were trading in the market at various times.

d) The payment takes due account of the disputed issues pertaining to liability and potential damages with respect to such persons and the derivative and other claims asserted in the Complaint as amended, considering the defenses asserted and the difficulties involved in the litigation of those claims.

21. As to the former Midwest shareholders who exchanged their stock for Standard stock in 1972, the proposed issuance of 0.231 Standard shares for each Midwest share exchanged, subject to attorneys' fees and expenses, is fair, reasonable, and adequate, especially in light of the following considerations:

a) The adjusted exchange ratio results in a substantial premium to Midwest minority shareholders who exchanged in 1972 when compared with the historical relationship between Midwest and Standard stock in such areas as per share earnings, cash generated, dividends, reinvestment, and market price.

b) The adjusted exchange ratio is reasonably in line with the liquidating value of Midwest assets as calculated on the basis of the evaluations of Midwest's properties which were made by independent petroleum engineers in 1970 and 1971.

c) The adjusted exchange ratio takes due account of the derivative and other claims asserted in the Complaint as amended, considering the defenses asserted and the difficulties involved in the litigation of those claims.

22. As to the present shareholders of Midwest, the Court finds that the proposed merger of Midwest with a Standard subsidiary on the terms and conditions embodied in the Settlement Agreement and at a ratio of 2.029 Standard shares for each Midwest share, subject to attorneys' fees and expenses, is fair, reasonable, and adequate. At present, Midwest stock is registered on the Midwest Stock Exchange, but Midwest shareholders have a limited market for their stock. Under the proposed merger, Midwest shareholders will receive Standard stock, which is actively traded on the New York Stock Exchange and other exchanges. The merger ratio of 2.029 Standard shares for each Midwest share, subject to attorneys' fees and expenses, is fair, reasonable, and adequate, especially in light of the following considerations.:

a) The merger ratio results in a substantial premium to Midwest minority shareholders when compared with the historical relationship between Midwest and Standard stock in such areas as per share earnings, cash generated, dividends, reinvestment, and market price.

b) The merger ratio affords present Midwest minority shareholders an increase in North American oil and gas reserves on a per share basis.

c) After appropriate revisions to reflect current market conditions, the merger ratio is reasonably in line with the liquidating value of Midwest assets as calculated on the basis of the evaluations of Midwest's properties which were made by independent petroleum engineers in 1970 and 1971.

d) The merger ratio takes due account of the derivative and other claims asserted in the Complaint as amended, considering the defenses asserted and the difficulties involved in the litigation of those claims.

The Court finds that any stockholder of Midwest who may dissent to the merger has no right to appraisal pursuant to Nevada General Corporation Law § 78.-521 for the reason that the Midwest shares are registered on a securities exchange.

23. The notice described in Paragraph 10 above advised class members that any claims or objections to the Settlement Agreement were to be presented to the Court at the hearing on 11 February 1974. The only objection filed was by Robert G. Clark, III, whose objection was limited to the settlement payment to open market sellers. No objections were filed to the settlement with respect to the tender or the exchange shareholders, nor were any objections filed to the terms of the proposed merger. The Court finds that there is no merit to the objections of Mr. Clark and that the amount being paid in settlement to open market sellers is fair, reasonable, and adequate, notwithstanding that different amounts are being paid in settlement to other former and present Midwest shareholders.

24. In light of all of the foregoing findings of fact and conclusions of law, a Final Judgment will be entered:

a) Approving the settlement and compromise of this case, including but not limited to the terms and conditions of the issuance and exchange of Standard voting common stock, as embodied in the Settlement Agreement, pursuant to Rules 23(e) and 23.1 of the Federal Rules of Civil Procedure as fair, reasonable, and adequate;

b) Overruling the objection of Robert G. Clark, III, to the Settlement Agreement;

c) Dismissing this action and the Complaint as amended with prejudice and without costs as to each and every claim previously asserted herein or which might have been asserted herein (whether direct, individual, class, derivative, or otherwise), including any and all claims with respect to the

merger provided for in paragraph 6–d) hereof;

d) Reserving jurisdiction with respect to the construction, enforcement, and administration of the settlement, the allowance of claims of class members, and the allowance of attorneys fees and reimbursement of out-of-pocket expenses to plaintiffs' counsel.

25. The Court expressly includes in these findings of fact and conclusions of law, by reference, the Court's bench ruling of 11 February 1974.

26. The Court expressly finds that there is no just reason for delay, and directs immediate entry of Final Judgment, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

### APPENDIX A

### MEMORANDUM OF AGREEMENT REGARDING SETTLEMENT OF MIDWEST LITIGATION

This Memorandum of Agreement sets forth the agreement reached this date between plaintiffs, the plaintiff class, defendant Standard Oil Company, an Indiana corporation (hereafter "Standard"), and nominal defendant Midwest Oil Corporation (hereafter "Midwest"), by their respective counsel. The basic purpose of this agreement is to compromise and settle all claims in the action entitled Oppenlander et al. v. Standard Oil Company et al., No. C–3414, pending in the United States District Court for the District of Colorado, said settlement to involve a merger of Midwest with a subsidiary of Standard and other terms and conditions which are deemed by the parties to be fair and reasonable giving due regard to their differing positions and the uncertainties of the litigation. By agreeing to this proposed settlement Standard does not admit, and on the contrary expressly denies, any and all claims that it has violated any provisions or obligations of federal or state law.

A. In order to effectuate the above-described purpose of this agreement and subject to paragraph C hereof, it is agreed that:

1. As an adjustment in the exchange ratio provided in the Standard Exchange Offer, dated March 2, 1972, Standard shall issue an additional 0.22 shares of Standard common voting stock for each Midwest share exchanged pursuant to said Exchange Offer by persons who file allowed proofs of claim as hereafter specified.

2. Standard shall pay $13 as damages for each Midwest share tendered pursuant to the Midwest Invitation for Tender, dated January 15, 1971, by persons who file allowed proofs of claim as hereafter specified.

3. Standard shall pay $6 as damages for each Midwest share held of record (directly or by nominee) on or after January 1, 1971 and sold on the open market prior to December 29, 1973 by persons who file allowed proofs of claim as hereafter specified.

4. Midwest shall be merged with a subsidiary of Standard as promptly as possible after Court approval of this proposed settlement, pursuant to a plan of merger whereby Standard shall issue 1.93 shares of Standard common voting stock for each Midwest share held of record as of the effective date of the merger by persons other than Standard.

5. In the event the closing price of Standard common stock traded on the New York Stock Exchange on the last business day preceding the hearing referred to in subparagraph B.2 hereof to consider approval of this proposed settlement shall exceed $105, (a) the number of Standard shares to be issued for each Midwest share pursuant to subparagraph A.1 hereof shall be 0.22 multiplied by $105 and divided by such closing price, and (b) the number of Standard shares to be issued for each Midwest share pursuant to subparagraph A.4 hereof shall be 1.93 multiplied by $105

and divided by such closing price. In the event the closing price of Standard common stock traded on the New York Stock Exchange on the last business day preceding said hearing shall be less than $95, (a) the number of Standard shares to be issued for each Midwest share pursuant to subparagraph A.1 hereof shall be 0.22 multiplied by $95 and divided by such closing price; and (b) the number of Standard shares to be issued for each Midwest share pursuant to subparagraph A.4 hereof shall be 1.93 multiplied by $95 and divided by such closing price.

6. Notwithstanding the provisions of subparagraphs A.1, A.4 and A.5 hereof, Standard shall not be obligated to issue fractional shares of its stock.

7. In the event this proposed settlement shall be approved by the Court, Civil Action No. C–3414 shall be dismissed with prejudice and without costs as to each and every claim asserted therein or which might have been asserted therein (whether direct, individual, class, derivative or otherwise), including any and all claims with respect to the merger provided in subparagraph A.4 hereof.

B. It is further agreed among the respective parties that the following procedural steps shall be taken to carry out the foregoing settlement:

1. On January 2, 1974, the parties shall present this Memorandum of Agreement to the Court for its review.

2. On or before January 7, 1974, the parties shall present to the Court for its approval a notice of this proposed settlement, including the merger referred to in subparagraph A.4 hereof, and of a hearing pursuant to Rules 23 and 23.1 of the Federal Rules of Civil Procedure to consider whether the Court shall approve said settlement; such notice to be given at Standard's expense by first class mail and by publication (two times) in the National Edition of the Wall Street Journal.

3. The notice referred to in subparagraph B.2 hereof shall also advise persons who have heretofore filed a request for exclusion from the class that they may revoke such request and obtain the benefits of the proposed settlement by filing a proof of claim as specified hereafter.

4. The notice referred to in subparagraph B.2 hereof shall also advise persons who have not heretofore filed a request for exclusion from the class, but who have not filed a proof of claim, that they may obtain the benefits of the proposed settlement by filing a proof of claim as specified hereafter.

5. The notice referred to in subparagraph B.2 hereof shall also advise brokers and other nominees who have not heretofore filed lists of the beneficial owners of the Midwest stock held by them that such brokers or other nominees may obtain the benefits of the proposed settlement for such beneficial owners by filing a proof of claim as specified hereafter and a statement that the broker or other nominee will disburse such benefits to the beneficial owners.

6. The proof of claim forms to be filed hereafter shall be filed not later than 60 days after the mailing of the notice referred to in subparagraph B.2 hereof and shall be limited to the facts indicating that the claimant tendered, exchanged or sold Midwest shares in the open market as provided in subparagraphs A.1 through A.3 hereof or presently owns Midwest shares. All proof of claim forms heretofore or hereafter filed shall be deemed prima facie evidence of the facts stated therein. Standard's right to object to such proof of claim forms shall be limited to the filing of a written statement pointing out to the District Court any facts indicating that the claimant is not entitled to the claimed benefits of the proposed settlement.

7. Standard shall cause a registration statement to become effective for such shares of its common voting stock as may be issued to effectuate this settlement, including the proposed merger referred to in subparagraph A.4 hereof, or shall obtain a no-action letter from the staff of the Securities and Exchange Commission indicating that the staff will recommend no action in the event such Standard shares are hereafter sold by the recipients of such shares pursuant to this proposed settlement.

8. Within 5 days following the approval of this proposed settlement by the District Court, Standard shall deposit in two trusts (a) sufficient shares of Standard common voting stock to satisfy its obligation under subparagraph A.1 hereof, and (b) sufficient cash to satisfy its obligations under subparagraphs A.2 and A.3 hereof. From such deposits, the trustees shall (a) distribute the shares and cash (including any income attributable thereto) required to pay the allowances for legal services and disbursements ordered by the Court pursuant to paragraph C hereof and allocable to claims under subparagraphs A.1 through A.3 hereof which are allowed by the Court; (b) distribute the shares and cash (including any income attributable thereto) allowed claimants under subparagraphs A.1 through A.3 hereof; and (c) refund to Standard all shares and cash (including any income attributable thereto) not required for distribution under the terms of this agreement. As to each trust, counsel for the plaintiff class shall name two trustees and counsel for Standard shall name one.

C. It is further agreed among the respective parties that counsel for plaintiffs and the plaintiff class shall be entitled to apply for and receive such reasonable allowances for their legal services and out-of-pocket disbursements in connection with this litigation as the District Court may order. Such allowances shall be based on the total benefits received by plaintiffs and the plaintiff class pursuant to this proposed settlement; provided, however, that the percentage of such allowances to be charged against persons receiving Standard shares pursuant to the merger referred to in subparagraphs A.4 and A.5 hereof shall be 10.5%; and provided further that none of such allowances shall be charged against any shares or cash refunded to Standard pursuant to subparagraph B.8 hereof.

D. The provisions of this proposed settlement may be modified by the Court without requiring further notice thereof to the plaintiff class; providing, however, that such modification is no less favorable to the plaintiff class; and provided further that Standard consents to such modification.

Dated this 29th day of December, 1973.

(s) J. Vernon Patrick, Jr.
J. Vernon Patrick, Jr.

(s) Patrick M. Westfeldt
Patrick M. Westfeldt

(s) John M. Scott
Attorneys for Richard C. Oppenlander, Mamie H. Oppenlander, L. F. Petersen, Willa Oleta Petersen and the plaintiff class.

(s) William R. Jentes
William R. Jentes
Attorney for Defendant Standard Oil Company (Indiana)

(s) Peter F. Breitenstein
Peter F. Breitenstein
Attorney for Midwest Oil Corporation